UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Reginald Hearon,

       Plaintiff,

v.                            Case No. 11-14481

City of Ferndale, *et al.*,         Honorable Sean F. Cox

       Defendants.
_____/

**OPINION & ORDER**
**GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

      In this action, a mental health detainee brought § 1983 claims against the City of

Ferndale and two of its police officers, claiming that the police officers violated his

Constitutional right to be free from unlawful searches and seizures and excessive force.  He also

asserts state-law tort claims against the officers.  The matter is currently before the Court on

Defendants' Motion for Summary Judgment.  The motion has been fully briefed by the parties

and the Court heard oral argument on this motion on February 28, 2013.  For the reasons set

forth below, the Court shall GRANT the motion and rule that: 1) the two officers are entitled to

qualified immunity because viewing the facts in the light most favorable to Plaintiff, Plaintiff

cannot establish a Constitutional violation as to either officer; 2) given that Plaintiff cannot

establish a Constitutional violation by the officers, Plaintiff's municipal liability claim against

the City must be dismissed; and 3) Defendants are entitled to summary judgment with respect to

Plaintiff's remaining state-law tort claims.

BACKGROUND

Plaintiff filed this action on October 11, 2011, asserting claims against the City of

Ferndale and two of its police officers, Paul Simpson and Keith Thibodeau.  Plaintiff's

Complaint asserts the following claims: "Violation of the Fourth Amendment 42 U.S.C. § 1983"

(Count I); "Assault and Battery" (Count II); "Gross Negligence" (Count III); "False Arrest /

False Imprisonment" (Count IV); Violation of the Fourth Amendment 42 U.S.C. § 1983 – Illegal

Search and Seizure" (Count V); and "City of Ferndale's Constitutional Violations" (Count VI).

After the close of discovery, Defendants filed the instant Motion for Summary Judgment.

This Court's practice guidelines are included in the Scheduling Order and provide, consistent

with Fed. R. Civ. P. 56 (c) and (e), that:

> a.  The moving party's papers shall include a separate document entitled
> Statement of Material Facts Not in Dispute.  The statement shall list in separately
> numbered paragraphs concise statements of each undisputed material fact,
> supported by appropriate citations to the record. . .
>
> b.  In response, the opposing party shall file a separate document entitled
> Counter-Statement of Disputed Facts.  The counter-statement shall list in
> separately numbered paragraphs following the order or the movant's statement,
> whether each of the facts asserted by the moving party is admitted or denied and
> shall also be supported by appropriate citations to the record.  The Counter-
> Statement shall also include, in a separate section, a list of each issue of material
> fact as to which it is contended there is a genuine issue for trial.
>
> c.  All material facts as set forth in the Statement of Material Facts Not in Dispute
> shall be deemed admitted unless controverted in the Counter-Statement of
> Disputed Facts.

(Docket Entry No. 30 at 2-3).  Defendants complied with the Court's practice guidelines for

motions for summary judgment such that their motion includes a "Statement of Material Facts

2

Not In Dispute" ("Defs.' "Stmt."). Plaintiff's response brief includes a "Counter-Statement of Disputed Facts" ("Pl.' s Stmt.").

The following material facts are gleaned from the evidence submitted by the parties, taken in the light most favorable to Plaintiff, the nonmoving party.

Plaintiff Reginald Hearon ("Plaintiff") is a forty-year-old man. (Pl.'s Dep. at 6). Plaintiff moved into Apartment 402 of the Autumn House in Ferndale, Michigan in approximately May of 2004. (Pl.'s Dep. at 13). The Ferndale Housing Commission operates the Autumn House. (Pl.'s Dep. at 13). Apartment 402 is a single-bedroom unit consisting of a bedroom, a kitchen, a living room area, and a bathroom. (Defs.' Stmt. at ¶ 2; Pl.'s Stmt. at ¶ 2).

While living at Autumn House, Plaintiff believed that he was being harassed by other tenants in the building, or persons around the building, who he believed to be homosexual men. (Pl.'s Dep. at 59-62).

Prior to February 18, 2010, Plaintiff wrote multiple letters to the Ferndale Housing Commission and the Ferndale Police Department, in which Plaintiff complained about harassment he perceived from gay men who he believed were "hitting on him." (*See* Exhibits B through K to Defs.' Br.). During his deposition, Plaintiff admitted writing all of these letters. Although the letters are rambling, and at times incoherent, they contain multiple statements reflecting threats made towards others in the building.

For example, a three-page handwritten letter sent to the Ferndale Housing Commission on or about August 4, 2009, complains generally about "the gays who keep bothering and harassing other people" and specifically speaks about a male tenant in Apartment 412. (Ex. B. to

3

Def.'s Br.).  Plaintiff asserts that nothing has been done about his complaints and states "thats

how it go's tho nothing seems to happen *until something violent takes place." Id.* (emphasis

added).  That letter ends by stating:

> and people wonder why Don't you Due this and that and thee other cas people get
> on your Dam nerves to the pointe where you just say the hell with everything and
> everybody you just get tired of putn up with the Bullspit then when you took all
> you can all these retarded ass people wanna then call you crazy how in the hell
> can I be crazy for not allowing people to abuse me anymore.  I have absolutely no
> words for fool ass people like that people who think like that should Be housed
> under the mental ward.

(*Id.*).

In another letter to the Ferndale Housing Commission, a fifteen-page handwritten letter,

Plaintiff complains about "the gay in 502."  (Ex. C to Defs.' Br.)  He further states:

> . . . I could have all types of problems but yet I still no how to conduct myself and
> treat others the way I wanna be treated people like that Don't like themselves and
> *when you hurt you have no other alternative but to try to hurt others* in which
> ever way.

(*Id.*) (emphasis added).  That letter further states:

> I'll have to go ahead and fight this one cus the stuff I put up wit since I've Been
> here I no for sho you wouldn't wanna put up with and so Due you I *have high
> Blood pressure these people can give me a stroke or a heart attake* if they keep
> upsetting and harrasn me you wanna evict me cus *I won't contribute to allown
> these people to kill me out or hinder my life* more than what it is come man What
> What

(*Id.*) (emphasis added).

In another letter that Plaintiff sent to the Ferndale Police Department Plaintiff begins by

stating:

> Dear F-P-D I Reginald Hearon Apt 402 Autumn House I have Been Down here

4

X3 to complain to you about these gays over here now theres some guy over here on the side of the library every nite I walk pass he's there so I stop goin to the gas station for a few nites to see if the faget was still there and he was not so I went to the store last nite again and then he was there again so that tells me that I'm Being WatchD you see this guy here is stalkn me as well he hasn't said anything yet But I no and you no from his M-O that sooner or later he will.  Now would hope that you guys or somebody would look into this cus I Be Dam if I keep on mindn my own Business and people just continue to harass me and try to force there will upon me yow em sick of that shit now guys it aint funny anymore *now if end up going upside one these gays head around here Im gonna expect you guys to be on my side now.*

(Ex. D to Defs.' Br.) (emphasis added).  At another point in the letter Plaintiff states that "like always *somethin probably is gonna have to happen to one of them* over here for them to learn."

(*Id.*) (emphasis added).

In another letter to the Ferndale Housing Commission Plaintiff again complains about

"the gay guy in 412" and states:

my Blood pressure is high now so if this guy Keeps Doin stuff to upset me why *I could have heart attache or a stroke* so the way I look at it he's threatning me . . . this guy is threatening my well Bein thats exactly what he Doin *so when it comes Down to it he will leave me no other choice But to Defend myself its either me or him and I Be Dam if its me you can't even mind your own Dam Business* <u>this is it</u> . . . .
I Don't Bother nobody here I never have an every time its problem its always the other tenants and I'm tired of it what <u>else Due you want me to Due</u> *go up side their heads* cus they need it then maybe they would act like they got a little sense you can't Be nice to people they'll run all over

(Ex. E to Defs.' Br.) (italics for emphasis; underlining in original).

In another letter, Plaintiff again complains about "the gays" and states: "I've told people

at the Doctor's office.  At the Stores.  Even telemarketers.  About how these gays harrass me

over here.  and the Judge will say all the reports you filed and letters you wrote you Done all in

5

your power to out of trouble Mr. Hearon you did that.  Everybody gets tired."  (Ex. H to Defs.'

Br.).

      In another letter, Plaintiff complains about management at his apartment building and

states:

> She Doesn't care guys em telln what I no, not what I think, When she has
> everything going for her But instead she rather Due things to *tick already
> mentally challenged people off* a person like that has not common sense or good
> juDgement what so ever cuz she Don't care about the people who she supervises
> nor the publics and certainly not yours *goD forBid tho if one of these mental
> people went off everybodys safety could Be in jeopardy* . . . if somebody went off
> and a tweek here or their could have prevented it then someBody Down here
> should Be put in jail cus you Knew the problem and had the power to fix it and
> Didn't when *you also knew full well that it Doesn't take much at all to set off
> mentally challenged people*.

(Ex. I to Defs.' Br.) (emphasis added).

      On June 10, 2009, Deborah Wilson of the Ferndale Housing Commission contacted the

Ferndale Police Department about threats made by Plaintiff.  (Ex. L to Defs.' Br.).  The police

report states:

> On 6/10/09 at 1400 hrs I was dispatched to 415 Withington in response to a
> Threats complaint.  I spoke with Debra Wilson from the Ferndale Housing
> Commission who stated that a tenant of the Autumn House located at 500 E Nine
> Mile left a letter threatening another tenant of the same building.  Wilson stated
> that Reginald Hearon of Apt #402 left a letter at her office which contained vague
> threats directed toward Dwayne Evans of Apt #412.
>
> I went to 500 E Nine Mile apt #402 and spoke with Hearon.  Hearon stated that he
> is constantly harassed by Evans and feels that the harassment is a threat to him
> due to the fact that he suffers from high blood pressure.  *Hearon stated he gets
> "so worked up" by Evans that he is afraid he will suffer a heart attack if the
> harassment doesn't stop.*  Hearon stated he left letters with the Housing
> Commission *stating he will be forced to take matters into his own hands* because
> he did not know what else to do.  I advised Hearon to contact FEPD if he

continued to have problems with Evans and to cease leaving threatening letters with Housing Commission. Hearon agreed to do so.

(*Id*.) (emphasis added).

Another police report, dated August 5, 2009, indicates that Plaintiff made a stalking complaint about the tenant in Apartment #412.  (Ex. M to Defs.' Br.).  That report states:

On 8/5/09 I responded to the FEPD lobby to investigate a stalking complaint.  Upon arrival I spoke with Reginald Hearon.

INTERVIEW WITH HEARON: Hearon stated he is a resident at the Autumn House room #402.  Hearon stated he is being constantly harassed and "hit on" by the B/M in room #412.  Hearon told me he is not gay and wants the unwanted advances and sexual remarks guided at him from the B/M in #412 to stop.  Hearon notified the Ferndale housing commission of the complaint and they ruled it as unfounded.  Hearon also wrote President Obama a letter complaining on the Ferndale housing commission.  See statement completed by Hearon.  Hearon believed the B/M's name was Darrell.

I bressered 500 E Nine Mile #412 and discovered it registered to Dwayne Claude Evans.  I went to the Autumn house and interviewed Evans.

INTERVIEW WITH EVANS: I informed Evans why I was there and asked him to tell me what was going on between him and the tenant in room 402.  Evans stated that he has no clue who the tenant of room 402 even is.  Evans denied having any unwanted contact with anyone in the building.  Evans stated he has never "hit on" or made any sexual advances to anyone in the building.  Evans was advised to try to avoid Hearon if possible.  I also advised Evans to follow up with the Ferndale Housing Commission on Wednesday.

After interviewing both parties Hearon's complaint appears to be unfounded.  Hearon could not sit still during our interview and was doing stretches.  Hearon appeared to be 3250.

(*Id.*).

Another police report from the Ferndale Police Department, dated November 2, 2009, (Ex. N to Defs.' Br.) states:

7

On 11/2/2009, Hearon walked into the station and made a complaint that he is being harassed by unknown gay men who are constantly lurking in the area. He reported that he has come into the station and reported this behavior to the police in the past but we haven't done anything about it. Hearon left a rambling letter about his situation. In his letter he writes that the behavior of the gay men that are "stalking" him *may cause him to harm them. Hearon adds that when the police show up to arrest him for harming these men, he can't be held responsible for harming the responding officers because he has given the police ample opportunity to help him and the police haven't done anything.*

Hearon appeared to be suffering from mental illness. The gay men he speaks of are seen by him at different hours and in odd locations. He claims these men are waiting for him in alleys and near buildings as he walks around. *Hearon has admitted to being prescribed psychological meds and does suffer from mental illness.*

Hearon has been listed as a suspect in similar complaints on numerous dates in the past.

(*Id.*) (emphasis added).

Another police report from the Ferndale Police Department, dated January 8, 2010, (Ex.

O to Defs.' Br.) states:

Introduction:

I, Officer Steven Carroll #611, made contact with Douglas Edwards who entered the police station and requested to file a threats report. Edwards stated that he was confronted by Reggie Huron (Suspect) while riding the elevator where they both reside, 500 east nine mile. Huron stated to Edwards while exiting the elevator "fuck all you faggots, *I'm gonna kill one of you bitches some day*." Edwards went to his Apt, #502, and at approximately 0345 am saw a letter being slid under his doorway. Edwards opened the door and observed Huron walking down the hallway. Edwards took the possession of the note and came to the police department to file a report.

Victims Statement: Douglas Edwards

Edwards who is gay was confronted by another resident (Reggie Huron) who resides at 500 east nine mile #402 while entering the elevator inside the apartment

8

complex at approximately 0315 hrs.  Huron stated "Fuck you faggots, *some day I'm gonna kill one of you bitches*".  Edwards got off the elevator and went to his apartment #502.  At approximately 0345 hrs Edwards observed something being slid under his apartment door.  Edwards opened his front door and observed Huron walking down the hallway, no one else around.  Edwards read the note which was threatening.

Officers Paragraph:

I made contact with the victim who entered the police station to make a threats report.  I obtained the victims personal information and requested a witness statement to be completed.  Edwards also produced a hand written note which he believes was left by the suspect.  I tagged the note, tage #485546, and placed it into the evidence closet at 300 east nine mile.  I attempted to make contact with the suspect who resides at 500 east nine mile #402, however no one answered the door.  the victim believes the suspect suffers from mental illness and has made numerous threats to other residents.

(*Id.*) (emphasis added).

During his deposition, Plaintiff admitted that he did, in fact, slip a handwritten note under

the door to Apartment #502.  (Pl.'s Dep. at 71-72).  Plaintiff testified as follows:

> Q.    What did it say?
> A.    It said I have been harassed numerous times, and I filed police reports and
>       wrote letters, and no one's going to – non one has done anything.  So if
>       you keep harassing me, knowing that I did all these things, *if I end up
>       hurting you no one's going to do anything.*

(*Id.*) (emphasis added).

On February 18, 2010, the Ferndale Housing Commission again contacted the Ferndale

Police Department about Plaintiff.  (Simpson Dep.; Ex. R to Defs.' Br.).  Officer Simpson met

with Deborah Wilson at the offices of the Ferndale Housing Commission.  Officer Simpson was

provided, and read, the various letters that Plaintiff had written.  He also read all of the prior

police reports concerning Plaintiff.  (Simpson Dep. at 26-32).  Based on Plaintiff's letters and the

police reports, Officer Simpson was concerned about Plaintiff's mental health and the threatening nature of his letters. (*Id.*).

Officer Simpson decided to visit Plaintiff at his apartment to evaluate Plaintiff. Officer Thibodeau, who had not reviewed the letters or police reports, was asked to accompany Officer Simpson. (Thibodeau Dep. at 16-20).

It is undisputed that Officers Simpson and Officer Thibodeau knocked on the door of Plaintiff's apartment and announced themselves as Ferndale Police Officers. (Defs.' Stmt. at ¶ 28; Pl.'s Stmt. at ¶ 28; Pl.'s Dep. at 95-96). It is also undisputed that Plaintiff responded by saying, "Come on in." (Defs.' Stmt. at ¶ 29; Pl.'s Stmt. at ¶ 29; Pl.'s Dep. at 95-96). The officers then entered the apartment.

The only furniture in Plaintiff's apartment on February 18, 2010, was a chair, a bed, and a television, which were all located in the bedroom. (Defs.' Stmt. at ¶ 3; Pl.'s Stmt. at ¶ 3). Thus, the officers observed that Plaintiff's living room and kitchen areas were empty.

Plaintiff testified that he told the officers how he was being harassed and how he had written letters. (Pl.'s Dep. at 96-97).

Officer Simpson testified that, consistent with Plaintiff's letters, Plaintiff told him that if the police department did not resolve the problem Plaintiff could "die of a heart attack" or that "somebody could get hurt." (Simpson Dep. at 35). Officer Simpson testified that Plaintiff told him he was mentally ill and that he was not seeing anybody for it. (*Id.*).

Plaintiff testified that one of the officers asked him what he was going to eat that day and then opened the refrigerator. (Pl.'s Dep. at 98). Officer Simpson testified that he checked Plaintiff's refrigerator and found it nearly empty. (Simpson Dep. at 36). Plaintiff testified as

follows:

> Q.   Okay.  What kind of food did you have in your refrigerator?
> A.   I think I had a lot of food then.  My mother had just went grocery
>       shopping, like – because they was just there that weekend.  They was just
>       there.  Like I told you, my aunt and my mother was just there that
>       weekend.  And they – and they got a lot of food, but – but I usually go out
>       all the time.  And I just eat – still just eat sweets, like Snickers and stuff
>       like that.  You know, I'm not a big eater.  So that's why they didn't see,
>       because I usually go to the store every week.

(Pl.'s Dep. at 103-04).

Plaintiff testified that, after being in his apartment for approximately ten minutes, the

officers told Plaintiff that they were taking Plaintiff to the hospital for a mental status exam.

(Pl.'s Dep. at 100-101).

It is undisputed that Plaintiff did not physically resist or threaten the officers while they

were at his apartment.  Officer Simpson testified that Plaintiff did not want to be committed and

that while Plaintiff had not physically resisted, he was concerned that Plaintiff would become

physically uncooperative and that the situation would escalate to a physical struggle.  (Simpson

Dep. at 37-39 & 42).

Plaintiff was first handcuffed in the apartment, before they proceeded to the ambulance.

(Pl.'s Dep. at 84).  According to the Statements submitted by the parties, it is undisputed that

Officer Simpson is the officer who handcuffed Plaintiff.  (Defs.' Stmt. at ¶ 38; Pl.'s Stmt. at ¶

38).  Plaintiff testified that it was the "skinny one" who put the handcuffs on him.  (Pl.'s Dep. at

101).

Plaintiff was initially handcuffed with his hands in the front of him.  Plaintiff testified

that he screamed when the handcuffs were first placed on him because they were tight:

. . . And then they put the handcuffs on me.  And only thing I remember, you

11

know, just – you know, just screaming, like whoa, because the handcuffs were real tight.  And then he said, you know, "Quit screaming, they going to get like tighter." And they just got like tighter.

(Pl.'s Dep. at 98-99).  Plaintiff further testified as follows:

> Q. Okay.  Prior to – strike that.
>      Did the officers ever loosen the handcuffs?
> A. They were getting tighter.  I mean I was – I was looking – I was screaming. I don't – he said he was loosening them, but I felt them getting tighter.
> Q. Okay.
> A. So, you know, I can't say it was.
> Q. So he said he was loosening them?
> A. Yeah.  He said, "I'm loosening them, but they're going to get tighter you keep trying to –"
> Q. Okay.  Which officer are we talking? About the short, stocky one?
> A. Yeah. Not the short stocky, but the thin one.
> Q. The skinny one?
> A. Right.
> Q. Is the skinny one the one who put the handcuffs on you?
> A. Yes.
> Q. Now, did he put the handcuffs on alone, or did he have assistance from –
> A. He just them on by himself.
> Q. By himself?
> A. Yeah.
> Q. And the stocky one didn't have anything to do with the handcuffs–
> A. No, sir.

(Pl.'s Dep. at 101-102).[1]

It is undisputed that there were at least four individuals at the scene once Plaintiff came down from his apartment: 1) Officer Simpson; 2) Officer Thibodeau; 3) Jack Pesha, a firefighter paramedic employed by the City of Ferndale; and 4) Dennis Barr, another firefighter paramedic

---

[1]Officer Simpson testified that does not remember Plaintiff ever complaining that the handcuffs were too tight and he does not recall loosening them.  (Simpson Dep. at 44).  Officer Thibodeau also testified that he does not recall that Plaintiff ever complained about the handcuffs being too tight and that he does not recall whether either he or Officer Simpson loosened the handcuffs at any time.  (Thibodeau Dep. at 29).  But for purposes of the motion, the Court must accept Plaintiff's testimony that he did complain.

employed by the City of Ferndale.

Plaintiff testified that one of the officers was heavyset or "thick and stocky" and that another officer was "thin and short" or "short and skinny". (Pl.'s Dep. at 86-87 & 101-102).

Plaintiff testified that he was walking toward the ambulance, with the handcuffs still on, when he fell of his own accord. That is, no one pushed Plaintiff, he just fell. (Pl.'s Dep. at 84 & 88-89). Plaintiff testified that he fell to the ground with the handcuffs still on. (*Id.*). Plaintiff testified that was when the "skinny short one" flipped him on his belly and uncuffed him. (*Id.* at 89). Plaintiff testified that the handcuffs, which were in front of Plaintiff, were taken off of him so that he could be handcuffed from the back. (Pl.'s Dep. at 84-85 & 89-91). Plaintiff claims that at this point he got kneed in the head by an officer who was trying to handcuff him with his hands behind his back. (*See* Pl.'s Dep. at 88-91). Plaintiff testified that this same officer was cursing and swearing at him. (*Id.*). Plaintiff testified that it was the thin and short officer who kneed him in the head:

> Q.  So [the] thin, short person kneed you?
> A.  Yes.
> . . . .
> Q.  Okay. And it was the short, thin officer that kneed you?
> A.  Yes sir.

(Pl.'s Dep. at 86-87).

Officer Simpson completed a Petition for Hospitalization, indicating that he believes that Plaintiff has mental illness and that, as a result of the illness, Plaintiff may pose a threat to himself or others. (Ex. T to Defs.' Br.). That Petition stated: "Hearon informed me I am being harassed by 4 or 5 gay males in the apartment building. If I argue with them I could have a heart attack and die. If this problem with the gays doesn't get solved, someone will get hurt." (*Id.*).

13

Plaintiff was taken to Beaumont Hospital, via ambulance, by the two firefighter paramedics, Jack Pesha and Dennis Barr. The narrative portion of the ambulance report prepared by Mr. Pesha states "pt. stated he fell and hit his head and had severely injured his back. ems witnessed entire event at no time pt. hit head or landed on back. pt. seemed to be fine and change his story several times of incident enroute." (Ex. Y to Defs.' Br.).

Records from Beaumont Hospital indicate that, upon arriving at the hospital, Plaintiff stated that he fell on the ground, that "the police kneed him in the head," and that he had a headache and back pain. The records reflect no complaints from Plaintiff regarding his wrists or any discomfort or injury from having been handcuffed too tightly. (Ex F to Pl.'s Br.)

The medical staff at Beaumont Hospital concluded that Plaintiff's "mood appears anxious", his "speech is rapid and/or pressured" and his "thought content is paranoid and delusional." (Ex. U to Defs.' Br. at 41). The medical staff noted that Plaintiff "expresses no homicidal and no suicidal ideation" and "expresses no suicidal plans and no homicidal plans." (*Id.*). Plaintiff was discharged later that same day, on February 18, 2010, with a recommendation for outpatient counseling services. (*Id.*).

Plaintiff filed this action on October 11, 2011.

During discovery, Officer Thibodeau testified that he is six feet two inches tall and weighs approximately 195 pounds. He testified that his weight was also approximately 195 on February 18, 2010. (Thibodeau Dep. at 7).

**Standard of Decision**

Summary judgment will be granted where there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact

14

exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S at 252.

The court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party." *Skousen v. Brighton High Sch*., 305 F.3d 520, 526 (6th Cir. 2002). "The court's duty to view the facts in the light most favorable to the nonmovant does not require or permit the court to accept mere allegations that are not supported by factual evidence." *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009). "This is so because the nonmovant, in response to a properly made and supported motion for summary judgment, cannot rely merely on allegations but must set out specific facts showing a genuine issue for trial." *Id.*

Moreover, the Court "is not obliged to, and should not, rely on the nonmovant's version where it is 'so utterly discredited by the record'" as to be rendered "visible fiction." *Chappell*, 585 F.3d at 906 (quoting *Scott v. Harris*, 550 U.S. 372, 378-80 (2007). "In *Scott*, the Eleventh Circuit was held to have erred by accepting the plaintiff's version of the facts as true even though that version was so conclusively contradicted by the record that no reasonable jury could believe it." *Chappell*, 585 F.3d at 906.

## ANALYSIS

## I.     The Individual Defendants Are Entitled To Qualified Immunity With Respect To Plaintiff's Section 1983 Claims

To state a claim under § 1983, a plaintiff must set forth facts that, when construed

15

favorably, establish: 1) the deprivation of a right secured by the Constitution or laws of the United States; 2) caused by a person acting under the color of state law. *Dominguez v. Correctional Medical Services,* 555 F.3d 543, 549 (6th Cir. 2009).

Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Id.; Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008). Determining whether government officials are entitled to qualified immunity generally requires two inquiries: 1) whether, viewing the facts in the light most favorable to the plaintiff, the plaintiff has shown that a constitutional violation occurred; and 2) whether the right was clearly established at the time of the violation. *Dominguez*, 555 F.3d at 549.

"[A] qualified immunity defense can be raised at various stages of the litigation including at the pleading stage in a motion to dismiss, after discovery in a motion for summary judgment, or as an affirmative defense at trial." *English v. Duke*, 23 F.3d 1086, 1089 (6th Cir. 1994).

Here, Defendants have raised the issue in the instant Motion for Summary Judgment, filed after the close of discovery.

Plaintiff's Complaint asserts the following § 1983 claims against the two individual Defendants: 1) "Violation of the Fourth Amendment 42 U.S.C. § 1983" (Count I), wherein Plaintiff asserts an excessive force claim; and 2) "Violation of the Fourth Amendment 42 U.S.C. § 1983 – Illegal Search and Seizure" (Count V), wherein Plaintiff alleges that the officers "violated Plaintiff's clearly established Fourth Amendment right to be free from unreasonable searches and seizures" and violated Plaintiff's Fourth Amendment rights when they entered his

16

apartment and when "they had Plaintiff committed to a hospital against his will and for no

justifiable reason whatsoever."

"Each defendant's liability must be assessed individually based on his [or her] own

actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). Generally, mere presence at

the scene, without a showing of direct responsibility for the action, will not subject an officer to

liability. *Id.*

### A.     Viewing The Facts In The Light Most Favorable To Plaintiff, Plaintiff Has Not Established A Constitutional Violation As To Either Officer

The first step in the qualified immunity analysis is to consider whether, viewing the facts

in the light most favorable to Plaintiff, could Plaintiff establish a Constitutional violation with

respect to either of the officers.

#### 1.     Excessive Force

Although Plaintiff's Complaint alleges additional acts of excessive force, Plaintiff

acknowledged during his deposition that such acts did not actually occur. For example,

Plaintiff's Complaint alleges that both officers forcefully pushed and shoved Plaintiff out of the

apartment and caused Plaintiff to fall. (*See* Compl. at ¶ 15, where Plaintiff alleges that while

"Plaintiff was handcuffed in the front of his body, both of the Defendants began to forcefully

push and shove Plaintiff out of the apartment" and ¶ 19, where Plaintiff alleges that "[a]s a result

of being forcefully and senselessly pushed by the Defendant police officers, Plaintiff fell on the

pavement, thereby causing significant and serious injuries"). But during his deposition, Plaintiff

acknowledged that he was not touched by the officers on the way to the ambulance and that

nobody pushed him to cause him to fall. (Pl.'s Dep. at 83-84 & 102-103).

17

Following the close of discovery, Plaintiff now contends that his excessive force claim is based upon two alleged actions: 1) Officer Simpson locking the handcuffs on Plaintiff's wrists too tightly and not loosening them despite Plaintiff's request that he do so; and 2) Officer Thibodeau striking Plaintiff in the head with his knee for no reason. (*See* Pl.'s Br. at 10). As explained below, the Court concludes that Plaintiff cannot establish a Constitutional violation as to either alleged incident, even construing the evidence in the light most favorable to him.

### a.       Being Handcuffed Too Tightly By Officer Simpson

The Fourth Amendment "prohibits unduly tight handcuffing." *Lyons v. City of Xenia*, 417 F.3d 565, 575 (6th Cir. 2005). "Not all allegations of tight handcuffing, however, amount to excessive force. In order to reach a jury on this claim, the plaintiff must allege some physical injury from the handcuffing" *and* "must show that the officers ignored plaintiff's complaints that the handcuffs were too tight." *Id.* (Citing *Neaque v. Cynkar*, 358 F.3d 504, 508 (6th Cir. 2001) and *Burchett v. Kiefer*, 310 F.3d 937, 944-45 (6th Cir. 2002)).

In *Lyons*, the Sixth Circuit concluded the plaintiff could not satisfy either of those requirements. Although the plaintiff had bruising on her wrist, she did not allege any other injury stemming from the handcuffing. *Lyons,* 417 F.3d at 575-76.

Here, Plaintiff testified that while he did not have a bruise on his hand following the handcuffing, he did have some marks on his left hand following the handcuffing but that he did not have any treatment for this alleged injury:

Q.      Okay. And you've got kind of a circle there[2] for – was there a bruise on

_____

[2]Plaintiff testified that he had his mother take some photos of him the day after the incident, including a photo of his wrist. (Pl.'s Dep. at 54-57). Plaintiff did not submit any photos in response to Defendants' Motion for Summary Judgment.

18

the outside of your left hand too?

A.   It was – it was like some marks, some handcuff marks.

Q.   Okay.  So it wasn't a bruise, it was just some marks?

A.   It was this, but it was some more like teeth marks, but they – they have since dissipated.

Q.   Okay.  Did you have to have any treatment for that?

A.   *No.  I didn't have any treatment*.  It was just – just hurt.

(Pl.'s Dep. at 57) (emphasis added).  And while the records from Beaumont Hospital indicate that Plaintiff stated that he had a headache and back pain, they indicate no complaints by Plaintiff regarding his wrists or any discomfort from having been handcuffed too tightly.  (Ex F to Pl.'s Br.)

In responding to Defendants' Motion for Summary Judgment, Plaintiff's brief states that "Plaintiff sought medical treatment at Michigan Head and Neck where he reported numbness in his fingers and hand due to the incident of February 18, 2010.  (Ex. G)."  (Pl.'s Br. at 11).  That assertion directly contradicts Plaintiff's August 17, 2012, deposition testimony that he "didn't have any treatment" for the alleged tight handcuffing.  Plaintiff cannot avoid summary judgment by making assertions that contradict his own deposition testimony.  Moreover, that assertion is not supported by the document attached as Exhibit G to Plaintiff's brief because the documents attached do not indicate that Plaintiff incurred any injuries due to being handcuffed too tightly.

Accordingly, the Court finds that Plaintiff has not met the above requirement that he incurred physical injury from being handcuffing too tightly.

In addition, it does not appear that Plaintiff could establish the other requirement in order to proceed with this claim – that Officer Simpson "ignored plaintiff's complaints that the handcuffs were too tight."  *Lyons*, 417 F.3d at 575.

Plaintiff's testimony does not establish that his alleged complaints about the handcuffs

19

were simply "ignored."  Plaintiff testified that the officer who placed the handcuffs on him initially attempted to loosen them, and then, soon after that, someone actually removed the handcuffs.

Plaintiff testified that after he complained about the handcuffs, the officer in question "said he was loosening them, but [he] felt them get tighter."  Plaintiff also testified that the officer said, "I'm loosening them, but they're going to get tighter you keep trying to –" (Pl.'s Dep. at 101-102).  The apparent cause for any increased tightness, however, was by implication of Plaintiff's own testimony, Plaintiff's own movements.  *Meadows v. Thomas*, 117 Fed. App'x 397, 405 (6th Cir. 2004).

In addition, Plaintiff complained about the handcuffs being tight after they had been initially placed on him.  Plaintiff testified that someone actually removed the handcuffs that had been originally placed on Plaintiff before Plaintiff entered the ambulance, and re-applied them on Plaintiff with his hands behind his back.  Plaintiff has not submitted any evidence to establish the amount of time that it took that person to remove the handcuffs after he complained. *Miller v. Sanilac County*, 606 F.3d 240, 252 (6th Cir. 2010).  Nor has he provided evidence that he complained about tightness after the handcuffs were re-applied.

Thus, even if he could establish that he incurred some kind of injury from being handcuffed, which he has failed to do, it cannot be said that the officer "ignored" Plaintiff's complaint.  *Id.*

The Court concludes that Plaintiff cannot establish a Constitutional violation with respect to his claim that Officer Simpson used excessive force by handcuffing him too tightly.

> **b.**      **Alleged Knee Strike To The Head By Officer Thibodeau**

If Plaintiff could establish that Officer Thibodeau actually struck Plaintiff in the head with his knee, while Plaintiff was on the ground and not resisting arrest, that would clearly constitute a Constitutional violation.  As explained below, however, the Court concludes that Plaintiff has not produced evidence that could allow a reasonable jury to conclude that *Officer Thibodeau* actually did that.

Plaintiff's Complaint alleged that "[o]nce outside of the apartment complex and on the way to an ambulance, Plaintiff fell and then the Defendant police officers" lifted Plaintiff off the ground, flipped Plaintiff onto his stomach, and then *one of the officers* jammed their knee into the back of his head."  (Compl. at ¶ 18) (emphasis added).  Thus, Plaintiff's complaint did not identify the officer who he alleges kneed the back of his head.

During his deposition, Plaintiff testified that a short and skinny officer, who he could not identify by name, kneed the side of his head.

Defendants' motion asserts that the record evidence establishes that no such knee strike ever occurred.

Now, following the close of discovery and in response to Defendants' motion, Plaintiff affirmatively claims that it was Officer Thibodeau who kneed his head.  (*See* Pl.'s Br. at 10).  In support of Plaintiff's claim that Officer Thibodeau kneed his head, Plaintiff's brief directs the Court to portions of Plaintiff's deposition testimony where Plaintiff testified that a short and skinny officer kneed his head.  Plaintiff has offered no evidence to establish that it was Officer Thibodeau who kneed his head.  During his deposition, Plaintiff testified that he did not know who the "short skinny one" is.  (Pl.'s Dep. at 103).  Plaintiff has not identified Officer Thibodeau – by name, by photo, or any other manner other than a physical description based on height and

21

weight – as the person who kneed him in the head.

And the undisputed evidence in the record establishes that Officer Thibodeau is six-foot-two inches tall and weighed approximately 195 pounds on the date of the incident. Thus, Officer Thibodeau clearly does not match the physical description of the "short and skinny" man who Plaintiff identified as having kneed him in the back of his head.

No genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S 574, 587 (1986).

Based upon the record taken as a whole here, no rational trier of fact could conclude that Officer Thibodeau kneed Plaintiff in the head on the date of the incident.

### 2.    Entry And Search In Apartment

Defendants contend that Plaintiff's claim that the officers violated his Fourth Amendment rights by entering his apartment without a warrant, and by opening the closet and refrigerator doors while inside the apartment, is precluded by Plaintiff's consent. The Court agrees.

"It is well-settled that a person may waive his Fourth Amendment rights by consenting to a search." *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004). "Consent to a search 'may be in the form of words, gesture, or conduct.'" *Carter*, 378 F.3d at 587 (quoting *United States v. Griffin*, 530 F.2d 739, 742 (7th Cir. 1976)).

Here, it is undisputed that Officers Simpson and Officer Thibodeau knocked on the door of Plaintiff's apartment and announced themselves as Ferndale Police Officers. (Defs.' Stmt. at ¶ 28; Pl.'s Stmt. at ¶ 28; Pl.'s Dep. at 95-96). It is also undisputed that Plaintiff responded by saying, "Come on in." (Defs.' Stmt. at ¶ 29; Pl.'s Stmt. at ¶ 29; Pl.'s Dep. at 95-96). Like the

22

situation in *Carter*, "[a]ny ordinary caller, under like circumstances, would understand assent to have been given, and the police are not held to a higher standard in this regard than an ordinary person." *Carter*, 378 F.3d at 588. "The police may be kept out or invited in as informally as any other guest. [Plaintiff] invited the police" into his apartment and "cannot undo his act in court." *Id*. at 589. Thus, the undisputed evidence establishes that Plaintiff gave consent for the officers to enter his apartment.

In his Response Brief, Plaintiff asserts that the officers violated his Fourth Amendment rights by opening his closet and refrigerator doors while inside Plaintiff's apartment. But once invited into Plaintiff's apartment, the officers "had the latitude of a guest in the [apartment] unless restricted by" Plaintiff. *Carter,* 378 F.3d at 589. There is no evidence that the officers here were restricted by Plaintiff once inside the apartment. To the contrary, Plaintiff testified as follows:

> Q.    Okay.  Did you ask the officers why they were looking around your
>        apartment?
> A.    I didn't say nothing.  I just let them go through it.  I didn't mind them.
> Q.    Wasn't a problem?
> A.    Uh-uh.

(Pl.'s Dep. at 105).

The Court therefore concludes that Plaintiff has not established that the officers violated his Fourth Amendment rights by entering Plaintiff's apartment without a warrant or by opening the closet or refrigerator doors.

### 3.    Detention Of Plaintiff

Defendants contend that Plaintiff cannot establish a Constitutional violation based upon Plaintiff's detention for a psychiatric evaluation because the undisputed facts show that the

officers had probable cause to believe that Plaintiff posed a danger to either himself or others. The Court agrees.

The Sixth Circuit has held that "in the context of a mental health seizure, an officer must have probable cause to believe that the person seized poses a danger to himself or others." *Ziegler v. Aukerman*, 512 F.3d 777, 783 (6th Cir. 2008) (citing *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997)). "A showing of probable cause in the mental health seizure context requires only a 'probability or substantial chance' of dangerous behavior, not an actual showing of such behavior." *Zielger,* 512 F.3d 783. "Just as actual innocence will not render invalid an arrest that is properly based upon probable cause that criminal activity was occurring, a mental health seizure can rest upon probable cause even when the person seized does not actually suffer from a dangerous mental condition." *Id.* Whether probable cause exists is to be evaluated "from the perspective of a reasonable and objective person in the position of the seizing official." *Id.*

Here, Officer Simpson was the official who concluded that there was a probability or substantial chance that Plaintiff may be a danger to himself or others.

Before making that assessment, Officer Simpson reviewed the letters from Plaintiff to the Ferndale Housing Commission and the Ferndale Police Department. Those letters, which at times are rambling and incoherent, contain language that a reasonable and objective person would construe as physically threatening other tenants in the building. Officer Simpson has also reviewed several police reports which stated that Plaintiff had advised others that he suffered from mental illness and was not receiving treatment for it. The police reports Officer Simpson reviewed also reflect that multiple tenants of the building reported being threatened by Plaintiff.

Then, upon entering Plaintiff's apartment, Officer Simpson observed that Plaintiff's

24

living room and kitchen were empty and that Plaintiff had what he considered to be little food in his refrigerator. And, consistent with the police reports and letters Officer Simpson had reviewed, Officer Simpson testified that Plaintiff: 1) told him that if the police department did not resolve the problem with the gays he could "die of a heart attack" or that "somebody could get hurt"; and 2) told him he was mentally ill and that he was not seeing anybody for it.

Thus, Officer Simpson had information, from credible sources, such that a reasonable person in his position would believe it probable that Plaintiff was a danger to himself or others.

Accordingly, construing the facts in the light most favorable to Plaintiff, it is clear that Officer Simpson had probable cause to seize Plaintiff and thus did not violate his Fourth Amendment rights when he took him into custody. Accordingly, Plaintiff's § 1983 claim on this ground must fail as a reasonable jury could not find that Officer Simpson violated Plaintiff's Constitutional rights when he took him into custody.

## II.     Plaintiff's Claims Against The City Must Be Dismissed Because Plaintiff Cannot Establish Municipal Liability

Defendants' motion contends that all claims against the City must be dismissed because Plaintiff cannot establish municipal liability. Defendants contend that Plaintiff's claims against the City must be dismissed because: 1) Plaintiff cannot establish that either of the officers violated Plaintiff's Constitutional rights; and 2) even if he could, he cannot establish municipal liability based on a failure-to-train theory.

### A.     Given That The Court Finds That Plaintiff Cannot Establish That Either Officer Violated His Constitutional Rights, Plaintiff's Municipal Liability Claim Must Also Be Dismissed

Count VI of Plaintiff's Complaint seeks to hold the City of Ferndale liable for the alleged Constitutional violations by the officers.

25

Because the Court finds that the individuals officers did not violate Plaintiff's Constitutional rights, however, Plaintiff cannot rely on their conduct to establish a claim of municipal liability against the City of Ferndale and Count VI must be dismissed. *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 404 (6th Cir. 2010); *see also Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) ("If no constitutional violation by the individual defendant is established, the municipal defendants cannot be held liable under § 1983.").

Accordingly, Count VI must be dismissed and no further analysis as to municipal liability is necessary.

**B.     In Addition, Even If Plaintiff Could Establish A Constitutional Violation By Either Officer, Plaintiff Cannot Establish Municipal Liability Here.**

A local government is only liable under § 1983 for its own wrongdoing and not under any theory of respondeat superior.  A municipality may, however, "be held liable under § 1983 if it maintained a policy or custom that caused the violation" of the plaintiff's rights.  *Harvey v. Campbell County*, 453 Fed.App'x 557, 562 (6th Cir. 2011).

"A plaintiff asserting a section 1983 claim on the basis of a municipal custom or policy must identify the policy, connect the policy to the County itself and show that the particular injury was incurred because of the execution of that policy." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004).

Here, however, Plaintiff does not base his claim against the City on any actual custom or policy.  Rather, Plaintiff's § 1983 claim against the City of Southfield is a claim predicated upon a "failure to train" theory of municipal liability.  (*See* Pl.'s Resp. at 6-7.)

In limited circumstances, a local government's failure to train police officers may be deemed a "policy or custom" for purposes of municipal liability. *City of Canton v. Harris*, 489

U.S. 378, 389 (1989).  "[I]nadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact*." City of Canton v. Harris*, 489 U.S. 378, 389 (1989).  "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."  *Id.*

"To establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the [City] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" *Miller*, 606 F.3d at 255 (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)).

Here, Plaintiff has not shown that the City knew of prior unconstitutional actions by its employees and failed to respond.  *Fisher,* 398 F.3d at 849.  Accordingly, the City would be entitled to summary judgment as to Count VI even if Plaintiff could establish a Constitutional violation by either Officer Simpson or Officer Thibodeau.

## III.    Plaintiff's State-Law Claims Must Also Be Dismissed

Plaintiff's Complaint contains the following claims based upon Michigan law:   "Assault and Battery" (Count II); "Gross Negligence" (Count III); and "False Arrest / False Imprisonment" (Count IV).

### A.    Assault And Battery

Defendants contend that they are entitled to summary judgment on Plaintiff's assault and battery claims for the same reasons they were entitled to summary judgment on his excessive force claims (ie., there is insufficient evidence supporting them) and because they are entitled to

27

governmental immunity under Michigan law.  The Court agrees.

Under Michigan law, an officer who uses excessive force in arresting an individual may be held liable for assault and battery.  *Bennett v. Krakowski*, 671 F.3d 553, 561 (6th Cir. 2011).  In determining whether an officer is entitled to governmental immunity, the court must decide whether there is a genuine issue of material fact as to whether the use of force was objectively reasonable.  This is the same analysis that the court uses for the claim under 42 U.S.C. § 1983."  *Id.*; *Lanman v. Hinson*, 529 F.3d 673, 690 (6th Cir. 2008) ("If an officer uses reasonable force in making a lawful seizure, then his actions are justified, and he is protected by immunity under Michigan law.").  Accordingly, given that the Court finds that Defendants are entitled to summary judgment on Plaintiff's § 1983 excessive force claims, Count II must be dismissed.

### B.      False Arrest / False Imprisonment

Under Michigan law, to prevail on a claim of false arrest or false imprisonment, a plaintiff must show that the arrest or seizure was not legal, ie., it was not based on probable cause.  *Hoover v. Walsh*, 682 F.3d 481, 501 (6th Cir. 2012) (quoting *Peterson Novelties, Inc. v. City of Berkley*, 259 Mich.App. 1 (2003)).  As discussed above, Officer Simpson had probable cause to seize and detain Plaintiff.  Given that conclusion, Defendants are entitled to summary judgment with respect to Count IV of Plaintiff's complaint.

### C.      "Gross Negligence"

That leaves Count III, titled "Gross Negligence", as Plaintiff's last remaining state-law claim.  As this Court has previously recognized, however, the governmental immunity statute does not create a cause of action called "gross negligence" and Michigan courts have consistently rejected attempts to transform claims involving elements of intentional torts into

28

claims of gross negligence. *Townsend v. Owen*, 2012 WL 33000988 (E.D. Mich. 2012) (citing *Cummins v. Robinson Twp.*, 283 Mich.App. 677, 692 (2009); *VanVourous v. Burmeister*, 262 Mich.App. 467 (2004); *Sudul v. Hamtramck*, 221 Mich.App. 455 (1997); and *Gentry v. Wayne Cty. Deputy Sheriff Camoa,* 2011 WL 4810847 (Mich.App. 2011)).  Thus, the Court shall dismiss Count III.

### CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendants' Motion for Summary Judgment is GRANTED and this action is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  March 6, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 6, 2013, by electronic and/or ordinary mail.

S/Jennifer McCoy
Case Manager

29